UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

| | |
|---|---|
| DAVID McIRVIN, | ) |
| Plaintiff, | ) CIVIL ACTION NO. 1:08-cv-127 |
| vs. | ) |
| WEST SIDE UNLIMITED CORPORATION, an Iowa Corporation, and DONALD A. VOGT, an Individual, | ) COMPLAINT & JURY DEMAND |
| Defendants. | ) |

Plaintiff states:

### JURISDICTIONAL STATEMENT

1. Jurisdiction is conferred upon this Court by 28 U.S.C. § 1332. Plaintiff claims damages in excess of $1,000,000, exclusive of interest and costs, and this is a controversy between citizens of different states.

2. Venue is properly placed in this jurisdiction because it is where a substantial part of the events or omissions giving rise to the claim occurred pursuant to 28 U.S.C. § 1391.

### PARTIES

3. Plaintiff David McIrvin ("McIrvin") is an individual and a citizen of Phoenix, Arizona. At all times material herein, McIrvin was a shareholder and officer of West Side Unlimited Corporation ("West Side").

4. Defendant West Side is an Iowa Corporation with its principal place of business in Cedar Rapids, Iowa.

5. Defendant Donald Vogt ("Vogt") is a resident of Florida, and at all times relevant, was an officer and Chairman of the Board of West Side, and majority shareholder, owning 92 percent of West Side's stock.

**COMMON ALLEGATIONS**

1. In December of 1997, McIrvin began his employment as the Chief Financial Officer with West Side.

2. As West Side was in desperate need of financial and management assistance, Defendant Vogt actively pursued and convinced McIrvin to leave the comfort of his partnership position in a private accounting practice to assist in making substantial improvements in Vogt's struggling business. A promise of opportunity and financial reward awaited McIrvin. Little did McIrvin know what awaited him.

3. During the five-and-one-half years prior to McIrvin's arrival at West Side (1992-1997), the corporation produced an average consolidated profit of $337,000 annually, or approximately $1.8 million over that period.

4. However, this five-and-a-half year profit includes the illusionary profit of approximately $1.2 million from selling semi-tractors to truck drivers. All of this profit from tractor sales was reversed in 1998 and 1999 when the truck drivers defaulted on the underlying debt on the tractors, reducing West Side's profits in 1998 and 1999. During the five and one-half years ending in 1997, the trucking company subsidiary, West Side Transport, performed exceptionally poorly culminated by an operating loss of approximately $1.4 million in the six months ending December 1997.

2

5. With this backdrop, Defendant Vogt promised McIrvin that he would be given significant latitude and discretion to ensure the financial success of West Side. Mr. Vogt was especially interested in Mr. McIrvin's financial and management expertise in substantially improving the trucking operational results.

6. Defendant Vogt also promised McIrvin the opportunity to become a shareholder in West Side, which not only created the illusion that Defendant Vogt was committed to McIrvin's success, but that McIrvin would have an real incentive to rehabilitate this business. Both were false.

7. Defendant Vogt assured McIrvin of his commitment and the corporation's commitment to financial rehabilitation, stability, and growth.

8. What became clear thereafter was that Defendant Vogt never planned to honor his commitment, and specifically, stifled McIrvin's ability to rehabilitate West Side to a flourishing business. Despite Vogt's conduct, McIrvin stabilized and created significant gains for the corporation.

9. On or about April 21, 1998, pursuant to the Stock Purchase Agreement attached hereto as Exhibit 1, McIrvin became a stockholder of West Side, obtaining 2,900 shares of common stock in West Side, which equaled a 2.8 percent ownership interest.

10. Due to McIrvin's exemplary financial management during the 10-year period of his employment, West Side produced an average consolidated profit of $1,797,000 annually.

11. While the corporation improved, this consolidated profit during this almost 10-year period, however, was reduced by profligate, unauthorized, and unapproved expenditures incurred by Defendant Vogt for his personal benefit.

3
Case 1:08-cv-00127-LRR    Document 1    Filed 10/20/08    Page 3 of 13

12. Between 1997 and 2008, Vogt showered himself and family members with lavish expenditures that had no legitimate business purpose and served only to deplete corporate assets for the benefit himself personally and for family members.

13. A conservative estimate of Vogt's corporate waste for personal gain is $8,000,000 to $9,000,000. With further analysis, this estimate will likely grow.

14. As a result, without these expenditures, West Side would have produced an average annual profit of no less than $2,597,000 over the course of 11 years. However, due to Vogt's lack of leadership and business focus, and lack of fiscal discipline, he diminished the value of West Side's stock for his own personal gain and benefit contrary to his fiduciary duties owed to the shareholders.

## THE DETAILS OF VOGT'S EXCESSIVE AND LAVISH LIFESTYLE

### The Jet Airplane

15. On the last business day of 1997, despite a promise to stop converting corporate assets to his personal use, Vogt purchased a Beechjet aircraft with corporate assets for approximately $5,000,000, without the approval of the Board. In fact, he amazingly purchased the jet aircraft only a few months after promising McIrvin the opportunity to clean up West Side. Vogt would not let his lifestyle suffer for the success of the corporation. This aircraft purchase caused an already highly-leveraged, deeply indebted business to be even more deeply in debt.

16. The jet aircraft was owned by West Side but remained in Florida with Vogt a majority of the time. The jet aircraft was used primarily by Vogt for personal and family purposes. In fact, the jet was used extensively to transport Mr. Vogt and his wife between their homes in Cedar Rapids and Florida.

4

17. A review of the flight logs demonstrates the flagrant abuse of his corporate position for personal gain. Flight logs establish that most of the trips were for Vogt to travel to and from his Florida home. In addition, Vogt utilized the jet for multiple trips to his brother's wedding in Texas for family and friends. At the end of 1997 when the jet was purchased, expected annual operating costs were $800,000 to $1,000,000 per year in a company that had produced annual net income of $337,000 per year.

18. By very late 2001, with West Side on the verge of bankruptcy due to Vogt's excessive and lavish lifestyle, and corporate financing sources no longer willing to finance losses in large part produced by the aircraft, Vogt finally agreed to dispose of the jet in early 2002. However, because of the onerous credit terms associated with Vogt's acquisition of the jet, West Side was compelled not only to return the airplane, but it was required to continue to make monthly payments of $15,500 for 42 months subsequent to return of the aircraft. In sum, the jet resulted in West Side incurring losses between 1998 and 2002 totaling $6,210,224.

### The Yacht and Fishing Trawler

19. In 2005 and 2006, Vogt continued his raid of the corporate treasury. He purchased two boats (one yacht and one fishing). He placed the ownership in a Florida corporation which he controls and then leased the boats back to West Side. Not only did Vogt want West Side to purchase the boats for his personal use, but he wanted West Side to pay him for that use. West Side is in the trucking, commodity recovery, and grain business in Iowa. It has no legitimate business reason to lease two boats in Florida so that they can be at Vogt's disposal.

20. Vogt charged West Side a shocking $60,000-$70,000 per month to charter the boats that were under his exclusive control and were for his personal use.

21. For example, Vogt even used the fishing trawler for a one-month getaway so that he and his wife could lobster-trap with a large group of other boats. For West Side to fund such a grandiose trip is irresponsible at best.

22. The boat chartering created losses for West Side totaling $1,706,984.

23. These losses during the ownership period, plus the jet's 42 monthly payments, plus the continuing financial costs are calculated as follows:

|  | **2002** | **2003** | **2004** | **2005** | **2006** | **2007** | **2008** |
|---|---|---|---|---|---|---|---|
| **Losses Financed** | $3,531,720 | $4,053,546 | $4,818,490 | $5,093,625 | $5,414,014 | $5,810,320 | $6,263,525 |
| **Interest Rate** | 7.06% | 5.87% | 5.71% | 6.29% | 7.32% | 7.80% | 7.74% |
| **Interest Costs** | $249,339 | $237,943 | $275,136 | $320,389 | $396,306 | $453,205 | $121,199 |
| **End of Year LOC Interest Rate** | 6.12% | 5.62% | 5.79% | 6.79% | 7.85% | 7.74% | |

## The Credit Card

24. As if Vogt's impunity in connection with the jet and the boats could not be eclipsed, Vogt compelled West Side to pay his personal credit card bill which typically exceeded $20,000 per month. Vogt was so arrogant in his theft of corporate assets that he refused to provide documentation as to the business purpose of the credit card expenditures. Rather than asking West Side's financial and accounting staff to reimburse him for any documented legitimate business expenditures, he simply wrote a business check in whatever amount he desired, which was typically in excess of $20,000 per month.

6

25. Mr. Vogt rarely provided any documentation to support the credit card statement expenditures, and periodic inquiry by Mr. McIrvin or West Side accounting staff was usually responded to with anger  However inquiry did determine that the credit card expenditures included items such as maintenance on his Florida home swimming pool and substance abuse treatment for his brother who is neither an employee nor a shareholder of West Side. It is inconceivable how these types of expenditures would constitute a legitimate business expense.

26. As CFO of West Side, on numerous occasions McIrvin advised Vogt that he was squandering corporate assets for his personal use, that his actions were inappropriate, and that he was reducing corporate assets and resources that could be used to further the business. Vogt and McIrvin had very heated arguments on several occasions and the Board of Directors repeatedly challenged Vogt regarding some of the most egregious expenditures. The Board of Directors never approved any of the expenditures discussed in this Complaint.

27. In 2000 Vogt, apparently tired of McIrvin's consistent challenging of his mis-use of corporate assets, devised a plot to change the dynamics of the relationship. In August 2000 while McIrvin was vacationing with family members, including his terminally ill father, Vogt directed two West Side employees loyal to him to spread a rumor that McIrvin was having an affair with a West Side female employee. When this false and baseless rumor reached McIrvin and the female employee, both confronted Vogt and the two Vogt-loyal employees responsible for the rumor. McIrvin demanded the two employees be appropriately disciplined or terminated. Vogt refused McIrvin's demand since the two employees were acting under his direction.

## THE CONSEQUENCES OF VOGT'S ACTIONS

28. The improper actions of Defendant Vogt created substantial reduction in profits or significant losses for West Side.

29. Defendant Vogt's improper and illegal actions have deprived West Side and McIrvin of its business, profits, income, and intangible assets.

30. West Side has been unable to perform in a responsible and financially prudent manner due to the actions of Defendant Vogt.

31. The value of each shareholders stock has been diminished as a direct and proximate result of Vogt's improper conduct.

## COUNT I
## SHAREHOLDER'S DERIVATIVE ACTION

1. McIrvin incorporates the Common Allegations as if fully set forth herein.

2. Plaintiff McIrvin is a shareholder of West Side.

3. Defendant Vogt is President and Chairman of the Board of West Side.

4. Defendant Vogt has breached his fiduciary duties and made fraudulent misrepresentations as follows:

   a. McIrvin had the latitude and discretion to save West Side from financial peril.

   b. Vogt would follow the counsel and advice of McIrvin to obtain such a goal.

   c. Vogt never intended to honor any of his commitments, but concealed and hid his intentions to continue his excessive lifestyle to the detriment of the corporation.

5. Vogt induced McIrvin to leave his private accounting practice and to invest his time and talent in a corporation whose stock would have value. As a result of Defendant's negligence and fraudulent misrepresentations, McIrvin has sustained damages.

WHEREFORE, Plaintiff prays for a judgment requiring Defendants to account for their profits and to make restitution to the corporation for losses caused by their fraudulent acts.

## COUNT II
## FRAUDULENT MISREPRESENTATION

1. McIrvin incorporates the Common Allegations as if fully set forth herein.

2. The conduct of West Side and Vogt constitutes fraudulent misrepresentation.

3. Defendants personally made false representations to McIrvin. Defendants West Side and Vogt falsely represented to McIrvin that he would have latitude and discretion to save Vogt's dramatically underperforming business; falsely represented that Vogt would accept and utilize McIrvin's counsel to reinvigorate the business; and that McIrvin's time and talent would result in appropriate financial opportunities directly related to his success.

4. These Defendants made further misrepresentations by silence upon matters in which Defendants were under an obligation and duty to disclose to McIrvin.

5. The false representations were material and the omissions related to material matters.

6. Each Defendant knew the representations were false when they were made.

7. Each Defendant intended to deceive McIrvin.

8. McIrvin acted in reliance on the truth of the representations and was justified in relying on the representations and omissions. McIrvin left his accounting practice, entered the shareholder agreement (attached hereto as Exhibit A), and relied upon Vogt's assurances. Vogt

induced McIrvin and then vitiated his attempts to succeed through his uncontrollable expenditures. Then, when McIrvin questioned Vogt's activities, Vogt terminated McIrvin's employment. McIrvin incurred substantial losses due to the fraudulent representations and actions of Vogt.

9. The misrepresentations and omissions were a proximate cause of McIrvin's damage. McIrvin would not have joined West Side nor entered the shareholder agreement, but for the false representations, nor incurred substantial losses in his shares' value due to such reliance.

10. McIrvin was damaged by each Defendant's misrepresentations and omissions in an indeterminable amount greater than the jurisdictional amount.

WHEREFORE, McIrvin demands judgment against all Defendants jointly and severally for actual damages, for attorneys' fees and for costs.

## COUNT III
## FRAUDULENT INDUCEMENT

1. McIrvin incorporates the Common Allegations as if fully set forth herein.

2. The conduct of West Side and Vogt constitutes fraudulent inducement.

3. The Defendants made material, false representations to induce McIrvin to enter into the shareholder's agreement in exchange for continued employment as the Chief Financial Officer.

4. Defendants personally made false representations to McIrvin. Defendants West Side and Vogt, through Vogt acting as its agent, falsely represented to McIrvin that West Side

10

would be run in a financially prudent manner and that Westside would follow McIrvin's advice in order to make the business profitable.

5. These Defendants made further misrepresentations by silence upon matters which Defendants were under an obligation and duty to disclose to McIrvin.

6. The false representations were material and the omissions related to material matters. The Defendants falsely represented that the expenditures had legitimate business purpose.

7. Each Defendant knew the representations were false when they were made.

8. Each Defendant intended to deceive McIrvin.

9. McIrvin acted in reliance on the truth of the representations and was justified in relying on the representations and omissions. McIrvin joined West Side and entered the shareholder agreement in reliance upon Vogt's and West Side's assurances. McIrvin incurred substantial losses due to the fraudulent representations and actions of Vogt.

10. The misrepresentations and omissions were a proximate cause of McIrvin's damage. McIrvin would not have entered into the agreement, but for the false representations, or incurred substantial losses in the value of his stock.

11. McIrvin was damaged by each Defendant's misrepresentations and omissions in an indeterminable amount greater than the jurisdictional amount.

WHEREFORE, McIrvin demands judgment against all Defendants jointly and severally for actual damages, for attorneys' fees and for costs.

## COUNT IV
## BREACH OF FIDUCIARY DUTY

1. McIrvin incorporates the Common Allegations as if fully set forth herein.

2. The conduct of each Defendant constitutes a breach of confidential or fiduciary relationship with McIrvin.

3. A relationship of trust and confidence existed between West Side and McIrvin initially.

4. Due to the nature of its confidential or fiduciary relationship, West Side and its officers had the duty to exercise the utmost good faith, to act in the mutual interests of West Side and McIrvin, to make and to continue to make full and truthful disclosures of all material facts, and to refrain from abusing such confidence by obtaining any advantage to West Side or Vogt at the expense of McIrvin.

5. McIrvin, by virtue of his confidential or fiduciary relationship with West Side, placed explicit faith, trust, and confidence in the representations and commitments made by West Side and Vogt.

6. As a direct and proximate result of Vogt's breach of fiduciary or confidential relationship, McIrvin has suffered damages.

WHEREFORE, McIrvin demands judgment against all Defendants jointly and severally for actual damages, for attorneys' fees and for costs.

## COUNT V
## PUNITIVE DAMAGES

1. McIrvin incorporates the Common Allegations as if fully set forth herein.

2. West Side and Vogt acted willfully, maliciously, intentionally, and with reckless disregard for McIrvin's rights.

3. The willful, intentional, and reckless conduct had the effect of damaging McIrvin.

4. West Side and Vogt should be assessed punitive damages in an amount sufficient to punish them for their conduct and to deter them and others similarly situated from such conduct in the future.

WHEREFORE, McIrvin demands punitive damages against each of these Defendants in an amount sufficient to punish them, and to deter them and others from similar wrongful conduct in the future.

### JURY DEMAND

Plaintiff requests trial by jury on all issues.

_____
KEVIN H. COLLINS AT0001671
MARK P. HUDSON  AT0003691
                for
SHUTTLEWORTH & INGERSOLL, P.L.C.
115 3rd Street S.E., Suite 500, P.O. Box 2107
Cedar Rapids, IA 52406-2107
PHONE:    (319) 365-9461
FAX:        (319) 365-8564
EMAIL:     khc@shuttleworthlaw.com

ATTORNEYS FOR PLAINTIFF