# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
## CEDAR RAPIDS DIVISION

DAVID McIRVIN,

       Plaintiff,

vs.

WEST SIDE UNLIMITED
CORPORATION and DONALD A.
VOGT,

       Defendants.

No. 08-CV-127-LRR

**ORDER**

_____

## *TABLE OF CONTENTS*

*I.*    *INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *2*

*II.*    *RELEVANT PROCEDURAL BACKGROUND* . . . . . . . . . . . . . . . . . . . . . *2*

*III.*    *SUBJECT MATTER JURISDICTION* . . . . . . . . . . . . . . . . . . . . . . . . . *3*

*IV.*    *STANDARD OF REVIEW* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *3*

*V.*    *FACTS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *4*
      *A.*    *Parties* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *4*
      *B.*    *West Side Hires McIrvin* . . . . . . . . . . . . . . . . . . . . . . . . . . *5*
           *1.*    *Employment Contract* . . . . . . . . . . . . . . . . . . . . . . . *5*
               *a.*    *Plaintiff's employment duties & West Side's authority* . . *5*
               *b.*    *Compensation* . . . . . . . . . . . . . . . . . . . . . . . . *7*
           *2.*    *Option* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *7*
      *C.*    *Plaintiff Begins Working for West Side* . . . . . . . . . . . . . . . . . *8*
      *D.*    *Plaintiff Exercises Rights Under the Option* . . . . . . . . . . . . . . *8*
      *E*    *Stockholders' Agreement* . . . . . . . . . . . . . . . . . . . . . . . . . *8*
      *F.*    *Vogt's Spending Habits* . . . . . . . . . . . . . . . . . . . . . . . . . *10*
           *1.*    *Jet* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *10*
           *2.*    *Yacht & fishing vessel* . . . . . . . . . . . . . . . . . . . . *10*
      *G.*    *West Side's Lack of Cash* . . . . . . . . . . . . . . . . . . . . . . . *10*
      *H.*    *Plaintiff's Job Duties Change* . . . . . . . . . . . . . . . . . . . . . *11*
      *I.*    *Amendment to the Employment Contract* . . . . . . . . . . . . . . . *11*
      *J.*    *Amendment to Stockholders' Agreement* . . . . . . . . . . . . . . *12*

K.      *Plaintiff Confronts Vogt*  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
L.      *West Side Terminates Plaintiff's Employment*  . . . . . . . . . . . . . . 12
M.      *Parties Dispute Redemption of Plaintiff's Shares*  . . . . . . . . . . . 12

VI.     *ANALYSIS*  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
A.      *Count I: Shareholder's Derivative Action*  . . . . . . . . . . . . . . . . . 13
        1.      *Pleading & proving derivative claim*  . . . . . . . . . . . . . . . . 13
        2.      *Rule 23.1 procedural requirements*  . . . . . . . . . . . . . . . . 14
        3.      *Summary*  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
B.      *Counts II & III: Fraudulent Misrepresentation & Fraudulent
        Inducement*  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
        1.      *Effect of integration clause*  . . . . . . . . . . . . . . . . . . . . . 17
                a.      *Misrepresentation about the scope of Plaintiff's authority
                        & financial opportunities*  . . . . . . . . . . . . . . . . . . . . 18
                b.      *Misrepresentations about spending*  . . . . . . . . . . . . 19
                c.      *Omissions*  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
                d.      *Timing of alleged fraud*  . . . . . . . . . . . . . . . . . . . . 20
                e.      *Plaintiff's argument:* Spreitzer  . . . . . . . . . . . . . . . . 21
        2.      *Effect of Amendment to the Employment Contract*  . . . . . . 21
        3.      *Summary*  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
C.      *Counts II, III & IV: Fraud Claims & Breach of Fiduciary Duty
        Claim*  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
D.      *Counts I-IV: Application of Statute of Limitations*  . . . . . . . . . . . 24
E.      *Punitive Damages*  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

VII.    *CONCLUSION*  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

## I. INTRODUCTION

The matter before the court is the "Motion for Summary Judgment" ("Motion") (docket no. 21), filed by Defendants West Side Unlimited Corporation ("West Side") and Donald A. Vogt ("Vogt").

## II. RELEVANT PROCEDURAL BACKGROUND

On October 20, 2008, Plaintiff David McIrvin filed a Complaint (docket no. 1). Plaintiff alleges four claims against Defendants: (1) a shareholder's derivative claim; (2) fraudulent misrepresentation; (3) fraudulent inducement; and (4) breach of fiduciary duty. The Complaint also contains a fifth cause of action, entitled "Punitive Damages."

Complaint at 12. The Complaint is not verified.

On November 10, 2008, Defendants filed an Answer and Counterclaim (docket no. 6) in which they denied the substance of the Complaint. In their Counterclaim, Defendants alleged claims for breach of contract and breach of fiduciary duty against Plaintiff.

On December 7, 2009, Defendants filed the Motion. On December 22, 2009, Plaintiff filed a Resistance (docket no. 22). On January 4, 2010, Defendants filed a Reply. On January 7, 2010, Plaintiff filed an Answer (docket no. 24) to the Counterclaim.

## III.  SUBJECT MATTER JURISDICTION

Plaintiff is a citizen of Phoenix, Arizona. West Side is an Iowa corporation with its principal place of business in Cedar Rapids, Iowa. Vogt is a resident of Florida. The amount in controversy exceeds $75,000. The court has subject matter jurisdiction over the instant action. *See* 28 U.S.C. § 1332(a)(1) ("The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000 [. . .] and is between [. . .] citizens of different States[.]").

## IV.  STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "An issue of fact is genuine when 'a reasonable jury could return a verdict for the nonmoving party' on the question." *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is material when it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. "[T]o establish the existence of a genuine issue of material fact, 'a plaintiff may not merely point to unsupported self-serving allegations.'" *Anda v. Wickes Furniture Co.*, 517 F.3d 526, 531 (8th Cir. 2008) (quoting *Bass v. SBC Commc'ns, Inc.*, 418 F.3d 870, 872 (8th Cir. 2005)). Rather, the nonmoving party "'must

substantiate [its] allegations with sufficient probative evidence that would permit a finding in [its] favor.'" *Anda*, 517 F.3d at 531 (quoting *Bass*, 418 F.3d at 873). The court must view the record in the light most favorable to the nonmoving party and afford it all reasonable inferences. *Baer Gallery, Inc. v. Citizen's Scholarship Found. of Am., Inc.*, 450 F.3d 816, 820 (8th Cir. 2006) (citing *Drake ex rel. Cotton v. Koss*, 445 F.3d 1038, 1042 (8th Cir. 2006)).

Procedurally, the moving party bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Once the moving party has successfully carried its burden under Rule 56(c), the nonmoving party has an affirmative burden to go beyond the pleadings and by depositions, affidavits, or otherwise, "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2); *see, e.g.*, *Baum v. Helget Gas Prods., Inc.*, 440 F.3d 1019, 1022 (8th Cir. 2006) ("Summary judgment is not appropriate if the non-moving party can set forth specific facts, by affidavit, deposition, or other evidence, showing a genuine issue for trial."). The nonmoving party must offer proof "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. "'Evidence, not contentions, avoids summary judgment.'" *Reasonover v. St. Louis County, Mo.*, 447 F.3d 569, 578 (8th Cir. 2006) (quoting *Mayer v. Nextel W. Corp.*, 318 F.3d 803, 809 (8th Cir. 2003)).

## *V. FACTS*

Viewing the facts in the light most favorable to the non-moving party, Plaintiff, and affording him all reasonable inferences, the undisputed facts are:

### *A. Parties*

Plaintiff is a citizen of Phoenix, Arizona. Plaintiff is a former resident of Iowa. At all times relevant to the instant action, Plaintiff was a shareholder, officer and employee

of West Side.

West Side is an Iowa corporation with its principal place of business in Cedar Rapids, Iowa. West Side "is in the business of truckload freight carriage, grain storage, and salvage." Defendants' Statement of Material Facts (docket no. 21-2), at ¶ 1. Each of these functions is performed "by separate corporations wholly owned by West Side, the holding company." *Id.* At all relevant times, West Side employed more than five hundred employees.

Vogt is currently the President and Chairman of West Side's Board of Directors. At all relevant times, Vogt was an officer and director of West Side. Vogt is also West Side's majority shareholder—he owns more than 95% of the outstanding shares of West Side. West Side has redeemed, or is in the process of redeeming, the shares of all of its remaining shareholders, with the exception of Vogt's sister.

### B. West Side Hires McIrvin

In late summer or early fall of 1997, Vogt approached Plaintiff and offered him a position at West Side. Prior to receiving West Side's offer, Plaintiff had "served as one of West Side's outside accountants for several years." *Id.* at ¶ 3.

#### 1. Employment Contract

On October 16, 1997, West Side and Plaintiff executed an employment contract ("Employment Contract"). Vogt signed the Employment Contract on behalf of West Side. The Employment Contract contained the following integration clause: "This Agreement supersedes all prior discussion and agreements between [West Side] and [Plaintiff] with respect to the subject matter hereof." Defendants' Appendix ("Def. App'x") (docket no. 21-3), at 27.

##### a. Plaintiff's employment duties & West Side's authority

The Employment Contract also sets forth the scope of Plaintiff's employment and duties, as well as West Side's authority over Plaintiff. The Employment Contract

provides:

> 1.    <u>PURPOSE AND EMPLOYMENT</u>.  The purpose of [the Employment Contract] is to define the relationship between [West Side] as an employer and [Plaintiff] as an employee of [West Side].  [West Side] hereby employees [sic] [Plaintiff] in the initial capacity of Executive Vice President and Chief Financial Officer, and [Plaintiff] hereby accepts employment by [West Side] upon all of the terms and conditions as hereinafter set forth.

> 2.    <u>DUTIES OF THE EMPLOYEE</u>.  During the term of his employment, [Plaintiff] shall devote his full business time and energies to [West Side] and use his best efforts, skills and abilities to promote the general welfare and interest of the business relationships with customers, suppliers, employees, banks and other financial institutions.  [West Side] will give [Plaintiff] a reasonable opportunity to perform such duties and shall not expect [Plaintiff] to devote more time hereunder, nor assign duties of functions to [Plaintiff] other than may be customary and reasonable for an executive in [Plaintiff]'s position.  Specifically, [Plaintiff] shall assist the officers of [West Side] in the overall management of all operations within the consolidated group of companies involving [West Side], including participation in and responsibility for conducting management meetings and providing input on strategic business planning with an emphasis on growing [West Side] and maximizing shareholder value.

> 3.    <u>CORPORATION'S AUTHORITY</u>.  [Plaintiff] agrees to observe and comply with the rules and regulations of [West Side] as adopted by [West Side]'s Board of Directors, either orally or in writing, respecting the performance of his duties, and to carry out and to perform orders, directions and policies announced to him by [West Side] from time to time, either orally or in writing.  The power to direct, control and supervise the manner of, and time for, performing [Plaintiff]'s duties, shall be exercised by [West Side]'s Board of Directors.

*Id.*

### b. Compensation

The Employment Contract also contains a compensation provision. The compensation provision states:

> For all the services to be rendered by [Plaintiff] in any capacity hereunder [. . . West Side] shall pay to [Plaintiff] during the term of this [Employment Contract] a monthly salary, such bonus or bonuses, if any, and such other fringe benefits and amenities as are set forth on Schedule A attached hereto.

*Id.* at 20.

Schedule A provides for incentive compensation. Specifically, Schedule A states: "As additional compensation and as an incentive to increase and maintain [West Side]'s profits, [Plaintiff] shall be entitled to receive additional compensation on a sliding scale of [West Side]'s consolidated net income." *Id.* at 29. Plaintiff's incentive compensation was calculated on the following scale: (1) two percent of the first $2 million of West Side's net income; (2) three percent of the next $3 million of West Side's net income; and (3) four percent of West Side's net income above $5 million.

### 2. Option

In conjunction with the Employment Contract, Plaintiff and West Side executed a Stock Option Plan ("Option"). The Option granted Plaintiff "an opportunity to purchase quantities of the corporation's shares." Defendants' Statement of Material Facts at ¶ 4. Vogt signed the Option on behalf of West Side. The Option provides, in relevant part:

> No later than January 1, 1998, [West Side] shall allow [Plaintiff] to purchase from its authorized and unissued shares of capital stock [. . .] shares at one hundred fifty percent (150%) of book value per share of the stock then outstanding, such book value to be determined from the financial statements ending December 31, 1997, as prepared by [West Side].

Def. App'x at 34, ¶ 2.

### C.  Plaintiff Begins Working for West Side

On December 1, 1997, Plaintiff began to work for West Side as its Chief Financial Officer ("CFO") and Executive Vice President.  West Side paid Plaintiff a salary of $10,000 per month.  Plaintiff's job responsibilities included "selection of the company's auditors, which audited West Side's books each year."  Defendants' Statement of Material Facts at ¶ 5.  Plaintiff was charged with making West Side's transportation business profitable.  As CFO, Plaintiff "was responsible for overseeing the operations of West Side and managing its finances."  Plaintiff's Statement of Material Facts (docket no. 22-1), at ¶ 16.  Plaintiff's duties also included "managing $25 to $50 million of debt" and "handling a variety of insurance issues, including health insurance,  liability insurance, workers['] compensation insurance[] and renewals."  *Id.* at ¶¶ 18 & 19.

In contrast, West Side's Controller and Payables Clerk ("Controller") handled West Side's "day to day" and "month to month" operations.  *Id.* at ¶ 20.  The Controller also dealt with West Side's "daily and monthly accounting operations, such as balancing the books and reconciling accounts."  *Id.* at 21.  The Controller "did detailed accounting work for West Side," and, for example, would have handled fifty different invoices on any given day.  *Id.* at ¶ 22.

### D.  Plaintiff Exercises Rights Under the Option

On April 21, 1998, Plaintiff exercised his right under the Option to purchase shares of West Side's stock.  Plaintiff purchased 2,900 shares of West Side's stock.  This amounted to a 2.8% ownership interest in West Side.  Plaintiff paid $166,137.38 for the stock.

### E.  Stockholders' Agreement

On April 21, 1999, West Side's stockholders, which included Vogt, John Vogt, Ronald Vogt, Dalean Larson and Plaintiff, entered into a written agreement ("Stockholders' Agreement").  West Side's stockholders entered into the Stockholders'

Agreement in part because they "wish[ed] to restrict ownership of [West Side stock] to the present Stockholders and to persons with whom they may comfortably and easily deal[.]" Stockholders' Agreement (docket no. 1-1), at 1-20, § C. West Side's stockholders "arrange[d] for certain restrictions on the [t]ransfer of the Stockholders' shares of [West Side stock] to persons other than the parties to [the Stockholders' Agreement]." *Id.* at § E.

The Stockholders' Agreement provides:

> <u>Termination of Employment.</u> The parties desire to limit the ownership of the Stock to Employee-Shareholders, it being in the best interests of [West Side] and the Stockholders. Therefore, it is agreed that any Stockholder who, at any time, ceases to be an Employee-Stockholder [. . .] shall be deemed to have offered to sell all of his or her shares of the Stock to [West Side] and the other Stockholders for the [Stockholders' Agreement] Price and on the [Stockholders' Agreement] Terms. Such offer shall be deemed made on the date on which such Stockholder ceased to be an Employee-Stockholder.
>
> The other Stockholders shall have sixty (60) days from such offer in which to elect to buy all, but not less than all, of the Offered Stock. The other Stockholders may elect to buy such shares of the Offered Stock in proportion to their respective ownership of the Stock (excluding the Offered Stock) or in such other proportion as they shall agree upon.
>
> If the other Stockholders shall decline to buy all of the Offered Stock within such sixty (60)-day period, [West Side] shall accept such deemed offer and buy all of the Offered Stock that the other Stockholders did not elect to buy.

*Id.* at §§ 1.3 - 1.3.2.

The Stockholders' Agreement set the price of the stock to "be equal to 150% times the book value of the Offered Stock on the last day of the fiscal month most recently ended prior to the date of any deemed offer." *Id.* at § 2.

### F. Vogt's Spending Habits

Vogt had a checkbook that allowed him to write checks from West Side's bank account. When Vogt wrote a check from West Side's account, the Controller decided whether to classify Vogt's purchase as a corporate expenditure or a personal expenditure. If the Controller classified the purchase as a personal expenditure, the Controller treated the purchase as an advance on Vogt's corporate dividends. Vogt frequently submitted expenses of $20,000 per month.

#### 1. Jet

On the last business day in 1997, "Vogt caused West Side to purchase a Beechjet aircraft for approximately $5,000,000." Plaintiff's Statement of Material Facts at ¶ 28. Vogt and the jet remained in Florida "for the majority of the time." *Id.* at ¶ 30.

The jet's annual operating cost was $800,000 to $1,000,000 per year. At that time, West Side's annual net income was $337,000.

#### 2. Yacht & fishing vessel

At some unknown time, Vogt made two other notable purchases: a yacht and a fishing vessel. Vogt purchased the yacht, an eighty-foot luxury "Lazzara," for $4,655,000. *Id.* at ¶ 49. Vogt purchased the fishing vessel for $950,000.

Vogt formed a Florida-based business that took possession and ownership of the yacht and fishing vessel. Vogt began to produce invoices from the Florida business for "chartering" services and submitted them to West Side. *Id.* at ¶ 53. Beginning in 2005, Vogt's Florida business charged West Side $60,000 to $70,000 each month to "charter" the yacht and fishing vessel in Florida. *Id.* at ¶ 54.

### G. West Side's Lack of Cash

In late 2001, West Side had no operating cash. This lack of cash was the result of poor economic conditions, the aftermath of 9-11 and the expenses associated with the jet. In February of 2002, West Side returned the jet to Raytheon Credit Corporation. Under

the terms of West Side's purchase of the jet, West Side was required to make monthly payments of $15,500 for 42 months after returning the jet. From 1998 to 2002, West Side incurred jet-related expenses in excess of $6 million.

### H. Plaintiff's Job Duties Change

In 2004, Plaintiff assumed the position of West Side's President and Chief Executive Officer ("CEO"). Consequently, Plaintiff's duties shifted to West Side's business strategy. Plaintiff's duties included determining the nature of West Side's business, deciding which potential customers to target, improving relationships with customers and communicating with employees.

### I. Amendment to the Employment Contract

On January 19, 2006, Plaintiff and West Side executed an amendment to the Employment Contract ("Amendment to the Employment Contract"). Vogt signed the Amendment to the Employment Contract on behalf of West Side. The Amendment to the Employment Contract was deemed effective as of January 1, 2006.

The Amendment to the Employment Contract increased Plaintiff's base compensation to $200,000 per year. The Amendment to the Employment Contract also modified Plaintiff's incentive compensation by setting it at 5% of West Side's consolidated net income each year.

The Amendment to the Employment Contract also included a "mutual commitments" provision. Def. App'x at 32. The mutual commitments provided that Plaintiff would remain West Side's President and CEO "at least until completion of the December 31, 2007 audited financial statements on or about February 15, 2008, provided that base compensation plus anticipated incentive compensation is anticipated to be no less than $300,000." *Id.*

In 2006, Plaintiff received payments from West Side in excess of $750,000. This amount was comprised of Plaintiff's salary, bonuses and dividends. During 2006, Plaintiff

began to spend a significant amount of time in Arizona. His wife, whom he married in April of 2006, resided in Arizona.

### J. Amendment to Stockholders' Agreement

On July 1, 2007, Plaintiff, Vogt, Ronald Vogt and Dalean Larson executed an amendment to the Stockholder's Agreement ("Amendment to Stockholders' Agreement"). The Amendment to Stockholders' Agreement modified § 2 of the Stockholders' Agreement to state: "The Agreement Price shall be equal to 225% times the book value of the Offered Stock on the last day of the fiscal month most recently ended prior to the date of any deemed offer." Amendment to Stockholders' Agreement (docket no. 21-3), at 60. The Amendment to Stockholders' Agreement "had the effect of increasing by 50% the redemption price of [Plaintiff's] shares of West Side." Defendants' Statement of Material Facts at ¶ 13.

### K. Plaintiff Confronts Vogt

In the summer of 2007, Plaintiff learned that Vogt had submitted a credit card statement to West Side and had asked West Side to pay $1000 for maintenance to his swimming pool in Florida. Plaintiff confronted Vogt about this expense.

In October of 2007, West Side held a meeting for its Board of Directors. At the meeting, Plaintiff and Vogt "had contentious discussions regarding Vogt's use of corporate assets for personal expenses." Plaintiff's Statement of Material Facts at ¶ 64.

### L. West Side Terminates Plaintiff's Employment

On November 6, 2007, West Side served Plaintiff with a two-month notice of termination of employment. Vogt also relieved Plaintiff from his active employment responsibilities. On February 15, 2008, West Side terminated Plaintiff's employment. During Plaintiff's tenure at West Side, West Side's annual profits exceeded $1.7 million.

### M. Parties Dispute Redemption of Plaintiff's Shares

Defendants claim that the redemption price of Plaintiff's shares is $716,534.80.

Defendants also claim that, pursuant to the various agreements between the parties, West Side sought to close on the redemption of Plaintiff's shares in May of 2008. West Side claims that it intended to present Plaintiff "with the first of 40 quarterly payments in the amount of $17,913.37, together with a note securing the balance." Defendants' Statement of Material Facts at ¶ 16. Plaintiff did not appear at the closing and has refused to tender his shares to West Side.

Plaintiff disagrees with Defendants' valuation of his West Side shares. Plaintiff believes that Vogt's use of corporate assets resulted in at least $8 million of corporate waste. Plaintiff believes that Vogt's conduct depressed the value of his shares and that Defendants improperly calculated the interest owed to him.

## VI. ANALYSIS

Defendants argue the court should grant the Motion and dismiss all of Plaintiff's claims. The court examines each of Defendants' arguments below.

### A. Count I: Shareholder's Derivative Action

Defendants argue the court should dismiss Count I, the shareholder's derivative claim. Defendants argue Plaintiff lacks standing to assert this claim, that he cannot satisfy his prima facie burden and that he failed to comply with the pleading requirements set forth in Federal Rule of Civil Procedure 23.1. The court examines each of these arguments, in turn.

#### 1. Pleading & proving derivative claim

Federal Rule of Civil Procedure 23.1 governs shareholder derivative actions. Rule 23.1 provides:

> This rule applies when one or more shareholders or members of a corporation or an unincorporated association bring a derivative action to enforce a right that the corporation or association may properly assert but has failed to enforce. The derivative action may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests

13

> of shareholders or members who are similarly situated in
> enforcing the right of the corporation or association.

Fed. R. Civ. P. 23.1(a); *see also* Iowa Code § 470.741.2 (providing that a plaintiff may bring a shareholder's derivative suit only if that shareholder "[f]airly and adequately represents the interests of the corporation in enforcing the right of the corporation").

Plaintiff does not have standing for a derivative action. To constitute a derivative action, the plaintiff-shareholder must seek to enforce a right held by the corporation. *Id.* In Count I, however, Plaintiff makes clear that he is only seeking relief for wrongs he suffered himself, not for any wrong perpetrated against West Side. For instance, Plaintiff alleges that Vogt induced him to leave his accounting practice to work for West Side, and that, because of Vogt's actions, Plaintiff—not West Side—sustained damages. Because Plaintiff only seeks relief for his own rights and not for West Side's rights, his so-called "derivative claim" fails.

The court also notes that Plaintiff wholly failed to resist this portion of the Motion. Because this portion of the Motion is unresisted and because Plaintiff has failed to show that he has standing to assert a shareholder's derivative claim, the court shall dismiss Count I. Similarly, Plaintiff has failed to set forth any evidence to satisfy his prima facie showing that he is seeking to enforce West Side's rights rather than a right of his own. Plaintiff does not resist Defendants' argument that he has failed to satisfy his prima facie burden on this claim. Accordingly, the court shall also dismiss Count I on this basis.

### 2. *Rule 23.1 procedural requirements*

Defendants also argue that Plaintiff failed to comply with a number of procedural requirements before initiating his shareholder's derivative claim. Federal Rule of Civil Procedure 23.1 requires a plaintiff who makes a derivative claim to: (1) verify the complaint; (2) "allege that the action is not a collusive one to confer jurisdiction that the court would otherwise lack"; and (3) state with particularity "any effort by the plaintiff to obtain the desired action from the directors or comparable authority [. . .] and [. . .] the

reasons for not obtaining the action or not making the effort." Fed. R. Civ. P. 23.1. Plaintiff argues that, due to the nature of West Side's corporate structure, he felt that seeking relief from West Side would have been futile. Plaintiff offers no explanation for the fact that (1) the Complaint is not verified; or (2) that he failed to allege that the instant action is not collusive. Instead, Plaintiff suggests that he "would request leave to amend [the] Complaint to comply with the procedural requirements of [Rule 23.1]." Resistance at 12.

Plaintiff has failed to file a formal motion with the court that specifically requests leave to amend. Even if the court construes Plaintiff's suggestion that he might request leave to amend as a "motion" to amend, Plaintiff has failed to comply with Local Rule 15. Local Rule 15 requires a party seeking to amend a pleading to "describe in the motion the changes sought, and [. . .] attach [. . .] the proposed amended or supplemented pleading." LR 15. Plaintiff did not file a proposed amended complaint. Because Plaintiff has failed to comply with Local Rule 15, the court deems it appropriate to deny any "motion" to amend the Complaint. Therefore, even if the relief Plaintiff seeks in Count I was truly a derivative claim, the court would nevertheless dismiss that claim because Plaintiff failed to comply with the procedural requirements in Rule 23.1.

### 3. Summary

The court finds that Count I fails as a matter of law because: (1) the relief Plaintiff seeks is not derivative of any of West Side's rights; (2) Plaintiff cannot set forth evidence to satisfy his prima facie burden on this claim; and (3) Plaintiff failed to comply with the procedural requirements for bringing such an action. Accordingly, the court shall dismiss Count I of the Complaint.

### B. Counts II & III: Fraudulent Misrepresentation & Fraudulent Inducement

Defendants argue that Counts II and III, fraudulent misrepresentation and fraudulent inducement, should be dismissed in light of the integration clause in the Employment

Contract and because Plaintiff executed the Amendment to the Employment Contract. Plaintiff argues that the integration clause should not bar his fraud claims because: (1) the alleged fraudulent representations were extraneous to the Employment Contract; and (2) in light of the Iowa Supreme Court's decision in *Spreitzer v. Hawkeye State Bank*, 775 N.W.2d 573 (Iowa 2009), dismissal would be inappropriate.

The elements of fraudulent misrepresentation are: "(1) representation; (2) falsity; (3) materiality; (4) scienter; (5) intent; (6) justifiable reliance; and (7) resulting injury or damage." *Hyler v. Garner*, 548 N.W.2d 864, 871 (Iowa 1996) (citing *McGough v. Gabus*, 526 N.W.2d 368, 331 (Iowa 1995)). The same elements apply in a fraudulent inducement case. *See Whalen v. Connelly*, 545 N.W.2d 284, 294 (Iowa 1996) (setting forth elements of fraudulent inducement that are the same as the elements of fraudulent misrepresentation).[1]

The court construes the Complaint to allege that Defendants made the following fraudulent misrepresentations and inducements: (1) Plaintiff "would have latitude and discretion to save Vogt's dramatically underperforming business"; (2) "Vogt would accept and utilize [Plaintiff]'s counsel to reinvigorate the business"; (3) Plaintiff's "time and talent would result in appropriate financial opportunities directly related to his success"; (4) "West Side would be run in a financially prudent manner"; (5) the expenditures at issue had a "legitimate business purpose"; and (6) "silence upon matters [that] Defendants were under an obligation and duty to disclose to [Plaintiff]." Complaint at Count II, ¶¶ 3 & 4;

---

[1] It is unclear why Plaintiff alleged separate claims of "fraudulent inducement" and "fraudulent misrepresentation." Iowa courts appear to treat these claims identically. *See In re Marriage of Arns*, No. 03-0724, 2004 WL 573801, at *3 (Iowa Ct. App. Mar. 24, 2004) (using "fraudulent inducement" and "fraudulent misrepresentation" interchangeably); *Griswold State Bank v. Milne*, 416 N.W.2d 109, 114 (Iowa Ct. App. 1987) (same); *cf. Vos v. Farm Bureau Life Ins. Co.*, 667 N.W.2d 36, 53 (Iowa 2003) (distinguishing claims of "common law fraud" (as opposed to fraudulent misrepresentation) and fraudulent inducement).

Count III, ¶¶ 4, 5 & 6. The court examines the effect of the integration clause and the effect of the Amendment to the Employment Contract with respect to each alleged fraudulent statement or inducement.

### 1. *Effect of integration clause*

"A fully integrated agreement is found where, based on the totality of the evidence, the writing appears to be the final and complete expression of the agreement." *Horton v. Uptown Partners, L.P.*, No. 05-0982, 2006 WL 1279044, at *5 (Iowa Ct. App. May 10, 2006) (citing *Montogomery Props. Corp. v. Econ. Forms Corp.*, 305 N.W.2d 470, 476 (Iowa 1981)).

> An agreement is fully integrated when the parties involved adopt a writing or writings as the final and complete expression of the agreement. *Montgomery Prop. Corp. v. Econ. Forms Corp.*, 305 N.W.2d 470, 476 (Iowa 1981). Whether or not a written agreement is integrated is a question of fact to be determined by the totality of the evidence. *See* Restatement (Second) of Contracts § 209 cmt. c (1981). When an agreement is deemed fully integrated, the parol evidence rule prevents the receipt of any extrinsic evidence to contradict (or even supplement) the terms of the written agreement. *Id.* at § 213.

*Whalen*, 545 N.W.2d at 290-91. "The general rule is that extrinsic evidence cannot be used to contradict or modify the terms of a fully integrated contract." *Frontier Leasing Corp. v. Meikle*, No. 07-1705, 2008 WL 5234370, at *2 (Iowa Ct. App. Dec. 17, 2008) (citing *Garland v. Branstad*, 648 N.W.2d 65, 69 (Iowa 2002)). The parties do not dispute that the Employment Contract is fully integrated.

"Although [the Iowa Supreme Court] ha[s] allowed fraudulent inducement claims to proceed despite an integration clause in a contract, [it] has done so only with regard to misrepresentations concerning facts or circumstances not included in the written contract." *Whalen*, 545 N.W.2d at 294. (citing *Robinson v. Perpetual Serv. Co.*, 412 N.W.2d 562, 565 (Iowa 1987)). When a "fine-print, boiler-plate" integration clause "was not intended

to encompass" the fraudulent representations or omissions at issue, then the integration clause does not bar the fraud claims. *Robinson*, 412 N.W.2d at 567. Accordingly, the court turns to consider whether the alleged misrepresentations or inducements are encompassed by or extraneous to the Employment Agreement.

### a. *Misrepresentations about the scope of Plaintiff's authority & financial opportunities*

The first and second misrepresentations, that Plaintiff would have "latitude and discretion to save" West Side and that Vogt would "accept and utilize" Plaintiff's advice, are encompassed by the Employment Contract. The Employment Contract specifically states that Plaintiff's job duties required him to "use his best efforts, skills and abilities to promote the general welfare and interest of [West Side] and to preserve, maintain and foster its business and business relationships[.]" Def. App'x at 19. The Employment Contract also provides that West Side would "give [Plaintiff] a reasonable opportunity to perform such duties[.]" *Id.* Essentially, West Side curbed Plaintiff's latitude and discretion to run West Side by expressly limiting the extent to which it would listen to and follow Plaintiff's advice—to the extent doing so was "reasonable." *Id.* Stated another way, the Employment Contract governed the amount of authority Plaintiff had over West Side's operations. Because the subject matter of these alleged misrepresentations and inducements is addressed by the Employment Contract, the court concludes that the integration clause was intended to bar any statement inconsistent with the Employment Contract, such as having "latitude and discretion to save" West Side and using and accepting Plaintiff's advice. Therefore, the court shall dismiss these claims. *Whalen*, 545 N.W.2d at 294.

The subject matter of the third misrepresentation, that Plaintiff's time and talent would result in appropriate financial opportunities directly related to his success, is also encompassed by the Employment Contract. Schedule A of the Employment Contract sets out specific measures of compensation for varying degrees of West Side's financial

success. For instance, if, under Plaintiff's leadership, West Side had a profit of $2 million, he would be entitled to incentive compensation of two percent of that profit, or $40,000. Additionally, Plaintiff's rights to obtain an ownership interest in West Side are set forth in the Stock Option Plan. In a nutshell, the Employment Contract gives Plaintiff the opportunity to enjoy incentive payments from West Side, as well as an ownership interest in West Side. The Employment Contract does not state that Plaintiff would receive "appropriate" financial opportunities that were "directly" related to his success. Because these misrepresentations are inconsistent with the Employment Contract, the court finds that they are barred by the integration clause. [2]

### b.    Misrepresentations about spending

The fourth allegation, that West Side would be run in a financially prudent manner, is extraneous to the Employment Contract. There is nothing in the Employment Contract that discusses or relates to this issue. Additionally, Defendants have failed to point to any provision in the Employment Contract that would encompass this issue. Because this subject matter is not contained in the Employment Contract, it is not barred by the integration clause. Accordingly, the court shall deny the Motion to the extent it asks the court to dismiss this alleged misrepresentation or inducement.

Similarly, the fifth allegation, that Defendants represented that the expenditures at issue had a "legitimate business purpose," is not encompassed by the Employment Contract. From the context of the Complaint, the court determines that Plaintiff alleges that this misrepresentation occurred *after* Plaintiff began working at West Side. That is,

---

[2] The court notes that Plaintiff could have alleged that West Side breached the Employment Contract by refusing to allow him a "reasonable opportunity" to fulfill his job duties. Instead, Plaintiff alleged a claim for fraudulent misrepresentation and contends that he was promised an "appropriate" financial opportunity rather than a "reasonable" opportunity. It is axiomatic that non-performance of a contract term alone does not form the basis of a fraud claim. *Irons v. Cmty. State Bank*, 461 N.W.2d 849, 854 (Iowa Ct. App. 1990). "Otherwise, every breach of contract would call for [a fraud] remedy." *Id.*

after the parties executed the Employment Contract. Because this alleged misrepresentation or inducement is not encompassed by the Employment Contract, the court shall deny the Motion to the extent it asks the court to dismiss it.

### c.     *Omissions*

Plaintiff alleges that Defendants made fraudulent omissions. Plaintiff alleges that Defendants were "silen[t] upon matters [that] Defendants were under an obligation and duty to disclose to [Plaintiff]." Complaint at Count II, ¶ 4 & Count III, ¶ 5. From the context of the Complaint, it appears that these omissions relate primarily to matters that occurred after the parties executed the Employment Contract. Accordingly, they are not barred by the integration clause and the court shall not deny the Motion to the extent it asks the court to dismiss them.

### d.     *Timing of alleged fraud*

Defendants argue that, to the extent Plaintiff alleges any fraudulent acts occurred after the parties executed the Employment Contract, they should be dismissed because Plaintiff cannot prove that he justifiably relied on them to leave his accounting practice and enter into the Employment Contract. Defendants oversimplify the nature of Plaintiff's reliance. To be sure, Plaintiff relied on certain alleged fraudulent misrepresentations and omissions when he left his accounting practice and agreed to the terms of the Employment Contract. Plaintiff also relied on these alleged fraudulent acts and omissions when he purchased shares of West Side. *See* Complaint at Count II, ¶ 9 & Count III, ¶ 10 (stating that, but for the false representations and omissions, Plaintiff would not have "incurred substantial losses" in the value of his West Side stock). In other words, had Plaintiff known of the alleged fraud, he could have avoided incurring a loss in the value of his stock by: (a) declining to exercise the Option; (b) purchasing a smaller amount of West Side shares; or (c) selling his West Side shares. Accordingly, the court shall not dismiss the alleged fraudulent misrepresentations and omissions on this basis.

### e.     *Plaintiff's argument:* **Spreitzer**

Plaintiff argues that the Iowa Supreme Court's decision in *Spreitzer v. Hawkeye State Bank*, 775 N.W.2d 573 (Iowa 2009) is somehow dispositive of the effect of the integration clause on his fraud claims. *Spreitzer* is not relevant to the instant analysis. *Spreitzer* discussed whether a plaintiff could justifiably rely on an oral misrepresentation that was inconsistent with the terms of a written contract. *Spreitzer*, 775 N.W.2d at 585 n.4. With respect to the claims the court shall dismiss based on the integration clause, justifiable reliance is not at issue. Rather, it is the presence of the integration clause that bars these claims—not a failure to show justifiable reliance. Accordingly, *Spreitzer* has no impact on these fraud allegations. Whether *Spreitzer* applies to the remaining fraud claims need not be decided in the instant Motion.

### 2.     *Effect of Amendment to the Employment Contract*

Alternatively, Defendants argue that the court should dismiss the fraud claims because, when Plaintiff executed the Amendment to the Employment Agreement, he waived these claims. "When a person with knowledge of a potential fraud enters into a new agreement concerning the same subject matter, he waives his claim to fraud in the original transaction." *Whalen*, 545 N.W.2d at 294 (citing 37 C.J.S. *Fraud* § 69 (1943)). The Amendment to the Employment Contract modified Plaintiff's compensation and incorporated the terms of the Employment Contract. As previously stated, the fraud claims related to Plaintiff's discretion to "save" West Side, the extent to which Defendants would follow Plaintiff's advice and Plaintiff's "appropriate financial opportunities" were inconsistent with and encompassed by the Employment Contract. For the same reason these fraud claims were encompassed by the Employment Contract, they are also encompassed by the Amendment to the Employment Contract. Consequently, Plaintiff waived these fraud claims when he entered into the Amendment to the Employment Contract because he knew about them at the time he reaffirmed the terms of the

Employment Contract. Accordingly, even if the court had not previously dismissed these claims in Section VI.B.1, it would dismiss them because they are barred by Plaintiff's execution of the Amendment to the Employment Contract.

The remaining fraud claims, which concern whether West Side would be run in a financially prudent manner, the propriety of Vogt's expenditures and any fraudulent omissions related to Vogt's expenditures, were not covered by the Amendment to the Employment Contract. Stated another way, the Amendment to the Employment Contract did not "concern" these alleged fraud claims. *Whalen*, 545 N.W.2d at 294. Therefore, Plaintiff did not waive those claims by executing the Amendment to the Employment Contract. *Id.*

### 3. Summary

In summary, the court shall dismiss Counts II and III in part in light of the integration clause in the Employment Contract and because Plaintiff had knowledge of these fraud claims at the time he executed the Amendment to the Employment Contract. The portions of Counts II and III that the court shall dismiss include alleged misrepresentations and inducements related to: (1) Plaintiff's latitude and discretion to save West Side's underperforming business; (2) Defendants' acceptance and use of Plaintiff's advice to improve West Side's profitability; and (3) whether Plaintiff's efforts would lead to appropriate financial opportunities directly related to his success. The fraud claims that shall remain for trial include: (1) whether West Side would be run in a financially prudent manner; (2) whether the expenditures at issue had a legitimate business purpose; and (3) any omissions related to Vogt's spending habits.

### C. Counts II, III & IV: Fraud Claims & Breach of Fiduciary Duty Claim

Defendants argue that the court should dismiss the fraud claims and the breach of fiduciary duty claim under the doctrine of estoppel by acquiescence and/or waiver. Defendants argue that, despite knowing about these claims, Plaintiff acquiesced to or

waived his objections to West Side's corporate transactions and continued to profit financially from his relationship with West Side.

"Estoppel by acquiescence focuses on whether the actions or inaction of the right-holder indicate an intention to waive a known, enforceable right." *McMillan v. Harker's Distrib., Inc.*, No. 07-0477, 2008 WL 4525770, at *2 (Iowa Ct. App. Oct. 1, 2008) (citing *Davidson v. Van Lengen*, 266 N.W.2d 436, 438 (Iowa 1978)). "This branch of estoppel law applies 'where a person knows or ought to know that he is entitled to enforce his right and neglects to do so for such a length of time as would imply that he intended to waive or abandon his right.'" *Id.* (quoting *Humboldt Livestock Auction, Inc. v. B & H Cattle Co.*, 155 N.W.2d 478, 487 (1967) (alterations omitted)). Knowledge is an element of acquiescence: "'Acquiescence' is where a person *knows* or *ought to know* that he is entitled to enforce his right or to impeach a transaction, and neglects to do so for such a length of time as would imply that he intended to waive or abandon his right." *Humboldt*, 155 N.W.2d at 487 (emphasis added).

Waiver is similar to acquiescence. "Waiver is defined as 'the voluntary or intentional relinquishment of a known right.'" *Smith v. Meadows*, No. 08-1872, 2009 WL 3379079, at *2 (Iowa Ct. App. Oct. 21, 2009) (quoting *Scheetz v. IMT Mut. Ins. Co.*, 324 N.W.2d 302, 304 (Iowa 1982)). "'The essential elements of a waiver are the existence of a right, knowledge, actual or constructive, and an intention to relinquish such right.'" *Id.* (quoting *Scheetz*, 324 N.W.2d at 304). "Where acts and conduct are relied upon as proof of waiver, the intention of the party charged with waiving his rights must clearly appear." *Id.* (citing *Cont'l Cas. Co. v. G.R. Kinney Co.*, 140 N.W.2d 129, 130 (1996)).

An essential element of both acquiescence and waiver is the right-holder's knowledge of his or her right to waive or acquiesce to something. *Smith*, 2009 WL 3379079, at *2; *McMillan*, 2008 WL 4525770, at *2. Defendants have not cited any evidence that shows Plaintiff knowingly waived or acquiesced to Vogt's spending habits

at any relevant time. Instead, Defendants simply assume that Plaintiff knew about all of Vogt's expenditures because he was West Side's CFO.

The court recognizes that Plaintiff knew about Vogt's purchase of the jet at some point in 2001, because he sought to divest West Side of the jet in 2001. However, Plaintiff cannot reasonably be understood to have acquiesced or waived objection to the purchase of the jet, it appears that he directed Vogt to return it.

As for the remainder of Vogt's questionable expenditures, such as "chartering" fees for Vogt's yacht and fishing vessel, Defendants have failed to set forth any evidence that shows Plaintiff was capable of acquiescing or waiving objection to these expenditures because it is unclear whether he knew about them at the relevant time. The court cannot infer from the Plaintiff's position as CFO that Plaintiff had knowledge of the extent and scope of Vogt's spending at all relevant times. As CFO, Plaintiff was removed from West Side's day-to-day and month-to-month spending. Supervision of that matter was left to West Side's Controller. Rather, Plaintiff's duties as CFO required a more global supervision of West Side's operations. And, once West Side promoted Plaintiff to CEO, Plaintiff became even further removed from West Side's spending. Defendants argue that the fact "Plaintiff does *not* assert his lack of knowledge is dispositive of his acquiescence and waiver in Vogt's spending." Reply at 3. The court disagrees. To conclude otherwise would force the court to draw an unfair inference against Plaintiff.

The court concludes that there is a genuine issue of material fact about when Plaintiff learned of Vogt's spending habits. Therefore, the court cannot apply the defenses of acquiescence or waiver to the instant action at this time. Accordingly, the court shall deny the Motion to the extent it asks the court to dismiss the remaining portions of Counts II, III and Count IV on the basis of acquiescence and waiver.

### D. Counts I-IV: Application of Statute of Limitations

Defendants argue that the court should dismiss Counts I-IV because they are barred

by the statute of limitations. The parties agree that the relevant statute of limitations is five years. *See* Iowa Code § 614.1(4) (stating that the following claims must be brought "within five years": those "founded on unwritten contracts, those brought for injuries to property, or for relief on the ground of fraud [. . .], and all other actions not otherwise provided for in this respect").

This defense is not set forth in the Answer. Federal Rule of Civil Procedure 8(c)(1) states that, when a party answers a complaint, it "must affirmatively state any avoidance or affirmative defense, including: [. . .] statute of limitations[.]" If a party fails to set forth such an affirmative defense in its responsive pleading, then that defense is generally waived. *See Varner v. Peterson Farms*, 371 F.3d 1011, 1017 (8th Cir. 2004) ("In order to avail itself of [a statute of limitations] defense, the party must specifically plead the defense in its answer."). However, the Eighth Circuit Court of Appeals has "recognize[d] that when it 'appears from the face of the complaint itself that the limitation period has run,' a limitations defense may properly be asserted through a Rule 12(b)(6) motion to dismiss." *Id.* (quoting *Wycoff v. Menke*, 773 F.2d 983, 984-85 (8th Cir. 1985)).

Defendants do not suggest that they may raise the statute of limitations defense for the first time in their Motion based on the "face of the complaint" exception. Indeed, Defendants do not respond to Plaintiff's argument that they failed to raise the statute of limitations defense in a timely fashion. The court finds that it is not clear that the statute of limitations had run based on the facts alleged in the Complaint. Plaintiff did not leave West Side's employment until February of 2008. The dates upon which claims for fraudulent misrepresentation, fraudulent inducement and breach of fiduciary duty accrued are unclear from the face of the Complaint. Accordingly, the court declines to apply the statute of limitations defense.

### E. Count V: Punitive Damages

Defendants ask the court to dismiss Count V, Plaintiff's claim for punitive damages,

because Plaintiff "cannot recover on any of his underlying claims." Brief in Support of Motion at 20. Because certain fraud claims and the claim for breach of fiduciary duty shall survive summary judgment, this argument is moot. However, the court shall nevertheless dismiss the claim for punitive damages. Under Iowa law, "'Punitive Damages' is not a cause of action." *Rakes v. Life Inv. Ins. Co. of Am.*, No. 06-CV-99-LRR, 2007 WL 2122195, at *7 (N.D. Iowa July 20, 2007) (Reade, C.J.). "Punitive damages are merely incidental to the main cause of action [. . .] and do not constitute an independent cause of action." *Scott v. Gen. Cas. Ins. Co.*, No. 01-0338, 2003 WL 288959, at *5 (Iowa Ct. App. Feb. 12, 2003) (citing *Campbell v. Van Rockel*, 347 N.W.2d 406, 510 (Iowa 1984)).

Dismissal of Count V, however, does not affect Plaintiff's right to seek punitive damages as a remedy at trial. *See Spreitzer*, 775 N.W.2d at 593 (citing *Tratchel v. Essex Group, Inc.*, 452 N.W.2d 171, 176 (Iowa 1990)) ("Punitive damages may be awarded in an action for fraud when, in conjunction with the fraud, the defendant acts with legal malice or engages in other aggravating conduct amounting to actual malice."); *Econ. Roofing & Insulating Co. v. Zumaris*, 538 N.W.2d 641, 655 (Iowa 1995) (reinstating verdict for punitive damages on claim for breach of fiduciary duty).

## VII. CONCLUSION

For the foregoing reasons, the Motion (docket no. 21) is **GRANTED IN PART AND DENIED IN PART** as follows:

(1)    Count I, "Shareholder's Derivative Action," is **DISMISSED**;

(2)    Count II, "Fraudulent Misrepresentation," is **DISMISSED IN PART** as discussed in Section VI.B.3;

(3)    Count III, "Fraudulent Inducement," is **DISMISSED IN PART** as discussed in Section VI.B.3;

(4)    Count V, "Punitive Damages," is **DISMISSED**; and

(5)    Plaintiff may pursue relief at trial on Count IV, "Breach of Fiduciary Duty,"

and on the portions of Counts II and III not dismissed in Section VI.B.3.

**IT IS SO ORDERED.**

**DATED** this 18th day of February, 2010.

LINDA R. READE
CHIEF JUDGE, U.S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA